**ASAHI CHEMICAL INDUSTRY CO., LTD., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**American Yarn Spinners Association, Party-in-Interest.**

**Court No. 80–5–00755–S.**

United States Court of International Trade.

July 25, 1988.

Barnes, Richardson & Colburn (Edwin F. Rains, James S. O'Kelly, Washington, D.C., and Richard Haroian, on the briefs) for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., (Velta A. Melnbrencis, New York City, on the briefs) for defendant.

Leva, Hawes, Symington, Martin & Oppenheimer (Joseph H. Price and Simeon M. Kriesberg, Washington, D.C., on the briefs) for party-in-interest.

RAO, Judge:

This case concerns spun acrylic yarn from Japan that was the subject of a petition filed by the Party-in-Interest, American Yarn Spinners Association (AYSA) with the Treasury Department on November 22, 1978. The petition alleged that spun acrylic yarn from Japan was or was likely to be sold at less than fair value (LTFV) within the meaning of the Antidumping Act of 1921, as amended. The Treasury Department (Treasury) determined that the petition was in proper form and, on January 4, 1979, initiated an antidumping investigation by publishing an Antidumping Proceeding Notice with regard to spun acrylic yarn from Japan in the *Federal Register.* 44 Fed.Reg. 1238–9. Subsequently, Treasury determined that there were reasonable grounds to believe or suspect that there were or were likely to be sales of spun acrylic yarn from Japan at LTFV and published a Withholding of Appraisement Notice on July 13, 1979. 44 Fed.Reg. 41004–5.

On October 25, 1979 Treasury published a notice of its Determination of Sales at Less than Fair Value with regard to spun acrylic yarn from Japan. 44 Fed.Reg. 61492–3. Plaintiff was one of three companies whose sales were examined during the investigation leading to this determination. On November 19, 1979 the United States International Trade Commission (ITC), having received advice from Treasury that spun acrylic yarn from Japan was or was likely to be sold at LTFV, instituted its investigation under 19 U.S.C. § 160(a) to determine whether an industry in the United States was being, or was likely to be, injured or prevented from being established by reason of such merchandise being imported into the United States.

The Trade Agreements Act of 1979 became effective on January 1, 1980. Pursuant to section 102(c) of that Act, the ITC was required to terminate its pending investigation of spun acrylic yarn from Japan and to initiate a new investigation under section 735 of the Tariff Act, 19 U.S.C. § 1673d, treating Treasury's LTFV determination as final. Accordingly, on January 17, 1980, the ITC published a notice terminating its pending investigation and instituting a new injury investigation.

AYSA has also filed a petition alleging that spun acrylic yarn from Italy was being sold at less than fair value, and this petition was processed in a manner similar to that the subject of this action.

On March 26, 1980, the ITC published its determination of material injury to an industry in the United States with regard to spun acrylic yarn from Japan and Italy. 45 Fed.Reg. 1968287.

Plaintiff challenges both the less than fair value determination of Treasury and the material injury determination of the ITC. It is plaintiff's position that the Treasury determination of sales at less than fair value was in error because Treasury failed to make appropriate adjustments to

foreign market value and because Treasury excluded 47 per cent of plaintiff's sales as being below the cost of production. Plaintiff challenges the ITC finding of material injury to an industry in the United States because it alleges that there was insufficient evidence that the volume and impact of sales of the merchandise from Japan affected domestic lost sales, price suppression, plant closings and domestic employment.

Defendant and AYSA both challenge plaintiff's standing to seek review of the decision to impose dumping duties made by Treasury under the Antidumping Act of 1921. It is their position that since Treasury's final LTFV determination was published on October 25, 1979, before the date on which the Trade Agreements Act of 1979 became effective, there are only three classes of persons to whom Congress had granted standing to challenge such a determination—(1) American manufacturers and wholesalers, (2) importers, and (3) consignees of the subject merchandise and that plaintiff, a foreign manufacturer, does not come within these classes of persons. Under the Antidumping Act of 1921 foreign manufacturers and exporters were not accorded the right to seek review of a dumping determination by the Treasury Department.

· It is plaintiff's position that it is not challenging the determination of Treasury of sales at LTFV under the Antidumping Act of 1921, but the decision of the Department of Commerce to impose dumping duties, which was made under the Trade Agreements Act of 1979. The Court agrees with this position.

■ Dumping duties are only assessed after there has been a finding of material injury or likelihood of material injury to an American industry, which occurs *after* the finding of sales at LTFV. Although a foreign manufacturer or importer may be very alarmed at having a LTFV determination made against .it, it may still hope that the ITC investigation would show that no American industry is *or* is likely to be injured by its sales. In such a case, no action would be required because no legal detriment would have been suffered since no dumping duties would be imposed. It is only *after* the dumping duties are to be assessed that the foreign manufacturer has been injured. .

In section 102(c)(2) of Title 1 of the Trade Agreements Act of 1979, 93 Stat. 144, 189–190, Congress provided that, on the effective date of Title VII of the Tariff Act of 1930, any final determination of the Secretary of the Treasury under the Antidumping Act of 1921 was to be treated as a final determination under section 735(a) of the Tariff Act of 1930 (the "new law"). It is beyond question that determinations under section 735(a) are reviewable by this Court when an action is commenced by a foreign manufacturer. See 19 U.S.C. § 1516a(a)(2)(B); *Royal Business Machines, Inc. et al. v. United States*, 1 CIT 80, 507 F.Supp. 1007, *aff'd* 69 CCPA 61, 669 F.2d 691 (1982).

We will .consider plaintiff's claims as to Treasury's finding of sales at less than fair value first. The LTFV investigation was conducted under the provisions of the Antidumping Act of 1921, as amended ("the Act"). Although the investigation originally was to cover the period of January 1 to June 30, 1978, it was extended to cover January 1 to December 31, 1978 because of fluctuations in the amount of imports during that year. Plaintiff, as well as other Japanese manufacturers of spun acrylic yarn, was notified of the investigation and was requested to present documentation of its pricing structure at a meeting to be held with the U.S. Customs Representative to Japan at the Japanese Ministry for International Trade and Industry (MITI). Plaintiff was furnished with a copy of the questionnaire prepared by Treasury with respect to spun acrylic yarn and was advised that assistance would be provided in answering the questions posed.

Asahi provided the information requested, both for the original period of investigation and for the extended period and, at the meeting at MITI, Asahi presented its records for inspection by the Special Customs Representative. It also submitted written responses to the questionnaire, and

submitted additional responses on written request from Treasury. At the meeting, the Special Customs Representative verified Asahi's responses to the questionnaire by checking invoices and sales agreements with both domestic and U.S. customers.

In arriving at the LTFV determination, Treasury compared the home market price with the price for export to the United States. Treasury concluded that approximately 47 per cent of the home market sales should be disregarded as being below the cost of production. In arriving at the below cost of production sales, Treasury disallowed certain items of cost, i.e., advertising costs, warehousing costs and interest costs, relying on Customs Regulations then in effect. Section 153.10(a) of the Customs Regulations provided:

Section 153.10 Fair Value; circumstances of sale.

(a) General. In comparing the purchase price or exporter's sales price, as the case may be, with the sales, or other criteria applicable, on which a determination of fair value is to be based, reasonable allowances will be made for bona fide differences in circumstances of sale if it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.

■ Treasury did not allow the warehousing and interest costs on the merchandise for sale in the home market because the expenses were general in nature and not tied to particular sales (A.R. 1153). Claims for administrative expenses of the sales department were not allowed because they did "not constitute circumstances of any particular sale, as required by section 153.10, Customs Regulations ..." according to the Final Determination of Sales at Less Than Fair Value of October 19, 1979 (A.R. 1153).

It is the view of this Court that Treasury's requirements concerning the authentification of costs were more stringent than was required by its own regulation and therefore contrary to law. The regulation requires only that there be a direct relationship between the expenses and the sales under consideration. Here, plaintiff presented information and supporting documentation for all its sales made during the period of investigation. Defendant does not allege that these expenses cannot be attributed to the sales under consideration, but that they were not attributable to specific sales. The sales under consideration were all sales in the home market during the investigative period. If the expenses considered by Treasury can be found to bear a direct relationship to these sales, they should have been allowed. For example, defendant disallowed warehousing costs for sales in the home market, because the yarn was warehoused before specific sales were made to purchasers. Yet plaintiff demonstrated that there were no warehousing costs with respect to sales for export, since the yarn was spun when the orders for export were received. On the other hand, domestic purchasers required faster delivery and plaintiff had to warehouse a variety of yarns for quick shipment to the Japanese purchasers of their yarns.

There was no other evidence before Treasury which would refute plaintiff's claim that warehousing expenses were paid only for yarn produced for the home market. Defendant alleges that the warehousing expenses should not be allowed since plaintiff would have incurred them regardless of whether plaintiff made *any* sales in the home market. That reasoning, conjectural since plaintiff *did* make sales in the home market, would not hold up when the period of investigation is a period of twelve months, as it is here. Plaintiff is a going business entity and it is unlikely that it would continue to stockpile yarn if no domestic sales were generated over a year's time.

■ Defendant, in not allowing expenses for advertising, also relied on language in Customs Regulation 153.10(b), which states that "allowances generally will not be

made for differences in advertising and other selling costs of a seller unless such costs are attributable to a later sale of merchandise to a purchaser ..." However, defendant failed to consider the first portion of that sentence, which conditions the portion of the sentence relied on:

Except in those instances where it is clearly established that the difference in circumstances of sale bear a direct relationship to the sales which are under consideration, allowances generally will not be made for differences in advertising and other selling costs of a seller unless such costs are attributable to a later sale of merchandise by a purchaser; * * *

In concluding that expenses for warehousing, laboratory costs, general research and development, and administrative expenses of the sales department should not be allowed, Treasury stated:

Expenses of these sorts are not considered to be the bases for adjustments because they do not constitute circumstances of any particular sale, * * *

The first test to be applied under 19 C.F.R. 153.10 is one of *direct relationship*, not whether the expenses can be tied to a particular sale. *Cf. Carlisle Tire & Rubber Co. v. United States*, 3 CIT 163 (1982), in which the Court applied the direct relationship standard.

It is the opinion of the Court, accordingly, that defendant applied an incorrect standard in arriving at the cost of production of spun acrylic yarn in the home market and that the portion of the dumping determination supported by its findings must be remanded to the Commerce Department for reconsideration of the home market prices.

In view of the fact that a redetermination of the home market prices may result in a conclusion that the sales of spun acrylic yarn from Japan were not made at less than fair value in this country, we will not overturn the ITC finding of injury to domestic manufacturers at this juncture. However, the Court is of the opinion that the ITC finding of material injury based on an investigation in which the impact of imports from both Japan and Italy were considered together would be contrary to the law. Plaintiff alleges that the industry evolved through three different phases in the late 1970's. In 1976 and 1977, there was a surge in the demand for the yarn because of the increase in the popularity of the "bulky" look. During this time both imports of the yarn and domestic production increased tremendously and the domestic producers were unable to meet the increased demand.

In 1978 demand flattened, the yen appreciated sharply against the dollar and imports from Japan decreased to minimal quantities and in 1979 ceased altogether. The ITC concluded that there was a delayed effect on the American industry because of the Japanese imports. This finding of a delayed effect was not sufficiently supported by the citation of circumstances in this particular industry. There was no evidence that Japanese imports were being stockpiled in the United States for future delivery to domestic customers. The evidence does show that Japanese imports increased sharply in the year when demand increased sharply and decreased sharply when the demand also declined sharply. For example, Japanese imports were highest in 1977, at the time that the domestic industry was also at its most profitable. However, in 1978 imports from Japan decreased more than 26 per cent or more than 3 million pounds, as demand for the merchandise also declined. In 1979 only 233,000 pounds of yarn was imported from Japan, and later in 1979 imports from Japan ceased all together.

It is important to note that the domestic industry did exceptionally well during 1976 and 1977. Domestic shipments increased by approximately 6 per cent and capacity utilization rose from 79.5 per cent to 85.4 per cent and man hours worked increased by approximately 4.5 per cent.

In 1978 total demand was off some 4.1 million pounds. Japanese imports dropped by 3.3 million pounds and in the last quarter of that year amounted to only .4 million pounds. During this time,

imports from sources other than Japan rose by 12.2 million pounds. It is unfair to the plaintiff, which was the subject of an investigation pertaining only to Japanese spun acrylic yarn, to have an injury determination based on import statistics covering both Japanese and Italian imports when Japanese imports were decreasing and Italian imports were increasing.

The comments of the Commissioners themselves show that Japanese imports were considered in conjunction with other imports. Commissioners Bedel and Moore stated that "[t]here is evidence of sales lost to imports from Japan and Italy during the period under review. Twelve firms state that the principal reason for purchase of the Japanese product in lieu of the domestic product was lower prices ... Two firms verified that the imported Italian yarn had been chosen over the domestic product." (A.R.I.T.C. List No. 1, Doc. 117, p. 6).

■ Commissioners Stern and Calhoun state that "[f]or the period January 1976–September 1979, five domestic spinners supplied information on specific lost sales to customers who had allegedly purchased spun acrylic yarn from Japan or Italy in lieu of U.S. produced yarn." (A.R.I.T.C., List No. 1, Doc. 117, p. 13). These commissioners drew conclusions from data spanning a five year period when the period of investigation was only one year. Their comments do not extrapolate the data for the year under investigation, and it is possible that the specific lost sales occurred during the period of highest demand. Nor do the comments differentiate between sales of Japanese and Italian merchandise. Conclusions reached when both these imports are being considered would be erroneous during periods when Japanese imports were decreasing and Italian or other imports were increasing.

Defendant and AYSA take the position that the ITC's determination need only be based on relevant evidence reasonably adequate to support its conclusions. They take the position that the substantial evidence test should be applied and that the agency determination should be upheld even if there is substantial evidence to support a contrary conclusion, even if the record evidence admits to conflicting interpretations and even if the determination rests on less than the weight of the evidence. The substantial evidence test does not permit the reviewing court to weigh the evidence, but only to ascertain whether the agency has drawn "such reasonable conclusions from its findings as in its discretion are appropriate." *Illinois Cent. RR. v. Norfolk & W. Ry.*, 385 U.S. 57, 69, 87 S.Ct. 255, 262, 17 L.Ed.2d 162 (1966). While the Court agrees with and adheres to the criteria for agency review expressed *supra,* it concludes that the methodolgy employed by the ITC in reaching its determinations was incorrect. Thus, it was improper for the ITC to consider the effect of Japanese and other imports in arriving at an injury determination as to Japanese imports, and it was error for the ITC to find injury to the domestic industry from Japanese imports in those years when Japanese imports decreased substantially, while other countries' imports increased.

For the above reasons, should it become necessary for the ITC determination to be remanded because Commerce, in reassessing its dumping finding based on the views expressed herein, has found additional evidence which leads to a dumping finding, the Court directs the ITC to re-examine its data with regard to injury based on Japanese imports alone during the period of investigation.