**LMI—LA METALLI INDUSTRIALE, S.p.A., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**American Brass, et al., Defendants–Intervenors.**

**Court No. 87–03–00560.**

United States Court of International Trade.

April 11, 1989.

Barnes, Richardson & Colburn, James H. Lundquist, David O. Elliott, New York City, and Matthew J. Clark, Los Angeles, Cal., and Sandra Liss Friedman, of counsel, for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Washington, D.C., M. Martha Ries; U.S. Dept. of Commerce Robert E. Nielsen, and Lyn M. Schlitt, General Counsel, James A. Toupin, Asst. Gen. Counsel, Calvin H. Cobb, III, of counsel, Washington, D.C., for defendant.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington, Carol A. Mitchell, and Kathleen Weaver Cannon, Washington, D.C., for defendants-intervenors.

DiCARLO, Judge:

An Italian manufacturer of brass sheet and strip, LMI—La Metalli Industriale, S.p. A. (IMI), moves under Rule 56.1 of the Rules of this Court to challenge the final determination of the International Trade Administration of the United States Department of Commerce (Commerce) that brass sheet and strip from Italy is being sold in the United States at less than fair value, *Final Determination of Sales at Less Than Fair Value: Brass Sheet and Strip from Italy*, 52 Fed.Reg. 816 (Jan. 9, 1987), *amended*, 52 Fed.Reg. 11,299 (Apr. 8, 1987), and also the final determination of

the United States International Trade Commission (Commission) that a domestic industry in the United States is being materially injured by reason of less than fair value imports of brass sheet and strip from Italy, as cumulated with dumped and subsidized imports from other countries, *Certain Brass Sheet and Strip from France, Italy, Sweden and West Germany,* Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316 and 317 (Final), USITC Pub. No. 1951 (Feb. 1987), 52 Fed.Reg. 5839 (Feb. 22, 1987).

The Court has jurisdiction under 28 U.S.C. § 1581(c) (1982). The Court affirms the denial of circumstance of sale adjustments for home market sales commissions, pre-sale inventory expenses, currency hedging expenses, and technical personnel salaries. The Court also finds that plaintiffs did not raise timely objections concerning credit rates under Italian law, and affirms Commerce's construction of a cost of credit based on a lira borrowing rate rather than a dollar borrowing rate. The Court also finds that the Commission need not distinguish between imports of large and small magnitude in applying the cumulation statute, and finds that the Commission's material injury determination is supported by substantial evidence on the record as a whole and is according to law.

## DISCUSSION

### I. COMMERCE'S LESS THAN FAIR VALUE DETERMINATION

#### A. *Denials of Circumstance of Sales Adjustments*

LMI claims that Commerce erred in denying circumstance of sales adjustments for (1) home market selling commissions; (2) technical service salaries; (3) pre-sale inventory costs; and (4) currency hedging expenses.

Commerce is directed to make circumstance of sale adjustments to foreign market value where it is established "to the satisfaction of the administering authority" that the difference between United States price and foreign market value is wholly or partly due to differences in circumstances of sale. 19 U.S.C. § 1677b(a)(4)(B) (1982 &

Supp. V 1987). As stated in *Smith–Corona Group, Consumer Prods. Div., SCM Corp. v. United States,* 1 Fed.Cir. (T) 130, 137, 713 F.2d 1568, 1575 (1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984):

> The statute does not expressly limit the exercise of the Secretary's authority to determine adjustments, nor does it include precise standards or guidelines to govern the exercise of that authority. Additionally, the statute does not define the term "circumstances of sale" nor does it prescribe any method for determining allowances. Congress has deferred to the Secretary's expertise in this matter.

*Accord Hercules, Inc. v. United States,* 11 CIT ——, 673 F.Supp. 454, 488 (1987); *Sawhill Tubular Div. Cyclops Corp. v. United States,* 11 CIT ——, 666 F.Supp. 1550, 1555 (1987).

The report of the House Committee on Ways and Means indicates that circumstance of sale adjustments "should be permitted if they are reasonably identifiable, quantifiable, and *directly related* to the sales under consideration and if there is clear and reasonable evidence of their existence and amount." H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979) (emphasis added); *see Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.,* 3 Fed.Cir. (T) 83, 89, 753 F.2d 1033, 1038 (1985). Commerce's regulations implementing 19 U.S.C. § 1677b(a)(4)(B) provide in relevant part:

> (a) In comparing the United States price with the sales, or other criteria applicable, on which a determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared to the extent that it is established to the satisfaction of the Secretary that the amount of any price differential is wholly or partly due to such differences. Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a *direct relationship to the sales which are under consideration.*

(b) Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

19 C.F.R. § 353.15 (1988) (emphasis added). To claim a circumstance of sale adjustment to foreign market value, expenses must be related to the sales of the products under investigation, rather than to sales generally. *See Ipsco, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 633, 642 (1988). Adjustments for indirect expenses are allowed where the exporter's sales price is the basis of the United States price. *Consumer Prods. Div., SCM Corp.*, 3 Fed.Cir. (T) at 86–87, 753 F.2d at 1036.

### 1. Home Market Selling Commissions

■ LMI contends Commerce should have allowed a circumstance of sale adjustment for home market selling commissions that LMI pays to its exclusive home-market sales agent and wholly-owned subsidiary, Pontinox Metallitalia S.R.L. (Pontinox). In denying the claimed adjustment, Commerce stated that it

does not allow circumstances-of-sale adjustments for commissions paid to related parties. The principal [*sic*] behind denying such an adjustment is that such payments are merely intracompany transfers of funds. We have accepted commissions to related parties only when we have determined that those commissions were arm's length or where the commissions are directly related to particular sales under review. [*Drycleaning Machinery from West Germany; Final Results of Administrative Review of Antidumping Finding*, 50 Fed.Reg. 32,154 (Aug. 8, 1985); *Egg Filler Flats from Canada; Final Determination of*

*Sales at Less Than Fair Value*, 50 Fed. Reg. 24,009 (June 7, 1985).] LMI has not met these prerequisites for a circumstance-of-sale adjustment for home market commissions.

52 Fed.Reg. at 818 (Comment 3).

LMI argues that Commerce's reliance on a "policy" should not be a lawful substitute for analyzing the record, and, in any event, there is no "positive evidence of record" to support Commerce's conclusion that LMI's commission payments were neither at arm's length nor directly related. *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record*, at 25–27. LMI argues that for Commerce to begin from a standpoint that related party commissions are generally invalid is inconsistent with 19 C.F.R. § 353.15(b), which provides that "[r]easonable allowances also generally will be made for differences in commissions." LMI argues that this regulation "contains no qualifications regarding the relationship between the payor and the payee of the commission." *Plaintiff's Reply to Defendant's and Defendant–Intervenors' Responses in Opposition*, at 13. LMI argues that its relationship with Pontinox is at arm's length because it is based upon a registered agreement that specifies independent rights, duties, and restrictions. Conf.R. 473–80.

Commerce does not dispute the existence of a contractual selling arrangement between LMI and its wholly-owned subsidiary Pontinox, but states that "such an arrangement by itself does not negate the relationship between the two parties nor does it demonstrate that the commission payments to Pontinox were anything more than an intracompany transfer of funds." *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record*, at 17–18. Commerce states that since LMI owns 100 percent of Pontinox, there can be no question but that the two parties are related. *See* 19 U.S.C. § 1677b(e)(3)(E) (1982) ("related party" includes anyone owning five percent or more of the outstanding voting stock or shares of any organization). Consistent with a long-standing practice, Commerce deter-

mined that LMI's commission payments to Pontinox constituted nothing more than an intracompany transfer of funds and disallowed the claimed adjustment. *See, e.g., Final Determination of Sales at Less Than Fair Value; Bicycle Tires and Tubes from Taiwan,* 48 Fed.Reg. 19,437, 19,438 (Apr. 29, 1983); *Prestressed Concrete Steel Wire Strand from the United Kingdom; Final Determination of Sales at Less Than Fair Value,* 47 Fed.Reg. 56,690, 56,692 (Dec. 20, 1982).

LMI claims that its commission payments were directly related and therefore entitled to be treated as a difference in the circumstances of sale in Italy and the United States.

The record shows that LMI agreed to pay Pontinox commissions based on the net value of sales on a variety of LMI products, only two of which were under investigation. Conf.R. 471, 477. The agreement between LMI and Pontinox explains that there are two types of payments to Pontinox: (1) a monthly sum in connection with expenses incurred by Pontinox while performing services that include administrative, accounting, credit, and support activities connected to business activities carried out in favor of LMI; and (2) a commission payment in return for Pontinox's services, calculated net of the value of raw material, packaging, transport, and other extra charges. R. 758. The 1985 profit margin of Pontinox was traced to *"total* revenues and *total* profits as shown in the Pontinox balance sheet." *Id.* (emphasis added). At verification, LMI "presented source documents used to calculate the percentage that total payments to Pontinox represent total LMI Italian sales of products under investigation and sales of other flat-rolled products." *Id.* Commerce verified that "total payments to Pontinox represent total LMI Italian sales of products under investigation *and* sales of other flat-rolled products." R. 758. LMI's documents did not permit Commerce to determine "which commission payments were made only on sales of the merchandise subject to investigation and which were paid on sales of merchandise not subject to investigation— even on a gross aggregate basis." *Defen-*

*dant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record,* at 22.

Although Commerce found that LMI and Pontinox were related parties and LMI's documentation did not permit separate identification of commissions paid on sales of only the merchandise under investigation, LMI claims its payments to Pontinox satisfy the criteria established in the two prior determinations that Commerce cited as authority to deny the circumstance of sale adjustment: *Drycleaning Machinery from West Germany; Final Results of Administrative Review of Antidumping Finding,* 50 Fed.Reg. 32,154 (Aug. 8, 1985); and *Egg Filler Flats from Canada; Final Determination of Sales at Less Than Fair Value,* 50 Fed.Reg. 24,009 (June 7, 1985).

Commerce allowed a circumstance of sale adjustment for commissions paid to individual salesmen in the *Drycleaning Machinery* review, because Commerce was satisfied that the payments to the salesmen

> were directly related to particular sales under review, in the form of percentages of the sales price of those sales. The percentages to be paid were detailed in contracts between the salesmen and the company.

50 Fed.Reg. at 32,155 (comment 7). Commerce also allowed an adjustment for commissions paid to a salesman in *Egg Filler Flats from Canada,* because Commerce determined that the salesman in question operated as an unrelated party:

> [A]lthough the salesman was an employee of the company, he received no salary; all payments to the salesman were directly related to particular sales, in the form of a percentage of the revenue accruing from those sales. The percentage to be paid was detailed in a contract between the salesman and the company. Additionally, the salesman paid for all of his sales-related expenses, with the exception of certain medical and other non-salary benefits. The cost of these benefits to the company was not included in the claim for the commission adjustment. Thus, the claimed adjustment for the

commissions paid to the salesman cannot be considered to be part of the general costs ..., since it is directly related to specific sales, and included no expenses which could not be tied to those sales.

50 Fed.Reg. at 24,010.

The Court finds a clear distinction between commission payments to individual salesmen and payments to wholly-owned corporate subsidiaries. A foreign producer could completely avoid a determination of sales at less than fair value merely by increasing the amount of its commission payments to its subsidiary company. An intra-company transfer of funds would not decrease the foreign producer's total revenue, but it could enable foreign corporations to sell in the United States at less than fair value. The Court affirms Commerce's denial of a circumstance of sale adjustment for commissions paid to LMI's wholly-owned subsidiary company.

### 2. Salaries of Technical Service Personnel

■ Commerce denied LMI's claimed circumstance of sale adjustment for technical service salary expenses incurred in the home market. Commerce stated that at verification,

LMI was unable to demonstrate adequately that these salaries are directly tied to the sales in question. Therefore, the Department did not allow that portion of technical services attributable to salaries.

52 Fed.Reg. at 817 (Comment 2).

The stringent limit on circumstance of sale adjustments for technical service salaries was fully discussed in *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 592 F.Supp. 1318 (1984), where Commerce had sought evidence that the services were performed to carry out the sales transactions at issue, rather than for other purposes such as basic research or promoting good will and future sales. The court found the distinction to be "critical given the statutory criteria for qualifying for a circumstance of sale adjustment," and that a "strict limit on adjustments for technical

services is consistent with the basic purposes of the antidumping law":

The antidumping law attempts to compare United States price and the foreign market value on as close to an equal basis as possible to determine whether the foreign manufacturer is charging a fair price in the export market.... [A]djustments to the United States price are limited to specific costs or benefits involved in the transaction that directly change the sale price. Therefore, adjustments to foreign market value must be similarly limited to provide a fair basis for comparison.

If Rhone Poulenc's sales obligations in France specifically included providing goods and technical services, and if Rhone Poulenc's sales obligations in the United States only included providing goods, then there would be different circumstances of sale under consideration. But to the extent the technical services were provided for independent purposes such as basic research or promoting good will and future sales, it would be inappropriate to permit a circumstances of sale adjustment. Costs of basic research benefit both the domestic and export market. It would be unfair to adjust for such expenses in one market and not the other. Costs incurred during the period of investigation to promote good will relate to future sales and *ipso facto* do not directly relate to the sales under consideration.

*Id.* at 66–67, 592 F.Supp. at 1335. The record in *Rhone Poulenc* showed that the responsibilities of the technical services group were not merely directed toward assisting customers to use products sold during the period of investigation, but were in large part directed toward research and maximizing future sales by developing new product applications. The court found Commerce's determination to be "clearly correct" that technical salaries and related personnel expenses were not directly related to sales because the employees involved were Rhone Poulenc's permanent staff members:

Salary and personnel expenses would have been incurred for these employees

regardless of whether Rhone Poulenc made any sales at all during the period of investigation. There is no direct relationship between these expenses and the sales under investigation. *Id.* at 67, 592 F.Supp. at 1335–36. The court recognized that adjustments might be allowed as being directly related to sales where, for example, workers are hired on a job basis to perform technical services and the manufacturer can "demonstrate which personnel expenses are incurred for the particular sales under investigation." *Id.*, 592 F.Supp. at 1336.

Commerce did not deny that LMI incurred technical service salary expenses in only its home market, but determined that LMI had failed to relate these expenses to sales of the brass sheet and strip under investigation. 52 Fed.Reg. at 817. Commerce did allow a portion of technical service expenditures attributable to travel expenses of technical personnel providing assistance at a customer's location. Commerce allowed these travel expenses "because the documents examined at verification support the claim that the travel and related expenses were directly related to sales of the products under investigation." 52 Fed.Reg. at 817.

LMI argues that because Commerce allowed an adjustment for the travel expenses of these technicians, Commerce must also make an adjustment for their salaries. LMI claims it is arbitrary for Commerce to find that the incidental expense of transporting a technician is directly related to sales of the merchandise under investigation, but that the provision of the services themselves is not directly related to sales of the merchandise under investigation.

The technical service positions were full-time salaried positions that did not differentiate brass sheet and strip under investigation and other LMI products. Although LMI claimed that the amount of time devoted by its salaried technicians to providing services to purchasers of brass sheet and strip products and to purchasers of other LMI products was "roughly equivalent," Conf.R. 629, Commerce determined that

LMI could have reviewed its records to ascertain precisely the amount of technical service expenses directly related to sales of the merchandise under investigation. *See* R. 762–63; Conf.R. 524. LMI did not demonstrate to the satisfaction of Commerce that the services were provided pursuant to specific sales contracts or agreements. Rather, LMI indicated that the provision of technical services was simply a company "policy." Conf.R. 467.

Plaintiffs bear the burden of demonstrating to the satisfaction of Commerce that they are entitled to a circumstance of sale adjustment for expenses directly related to sales. 19 U.S.C. § 1677b(a)(4)(B) (1982 & Supp. V 1987); 19 C.F.R. § 353.15(a) (1988); *Rhone Poulenc, S.A.,* 8 CIT at 64, 592 F.Supp. at 1333. It is not the function of this Court to decide whether it would have made the same decision on the basis of the evidence contained in the administrative record. *See Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). The Court's role is to determine whether Commerce's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982).

The Court finds that Commerce's denial of a circumstance of sale adjustment claimed for the technical service salaries is according to law and supported by the administrative record as a whole because LMI did not meet its burden of proving that the services were provided for the products under investigation.

### 3. Pre–Sale Inventory Expenses

■ LMI claims it should be allowed an adjustment for pre-sale inventory expenses related to home market sales. LMI contends that it maintains an inventory of merchandise solely to service the requirements of its customers in Italy. Sales of merchandise to the United States are made to order and, therefore, do not require warehousing.

Commerce disallowed the claimed adjustment because the financing costs "were incurred prior to sale and therefore, are not

directly related to the sales in question." 52 Fed.Reg. at 818. In past investigations Commerce had uniformly disallowed circumstance of sale adjustments for pre-sale inventory or warehousing expenses where expenses could not be directly related to the sales under investigation, because the warehousing expenses would have been incurred even if no sales had been made. *See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan; Final Determination of Sales at Less Than Fair Value,* 52 Fed. Reg. 30,700 (Aug. 17, 1987).

The existence of a well-explained prior administrative practice does not relieve a court of its responsibility to determine whether that practice is consistent with the agency's authority. *Securities and Exchange Comm'n v. Sloan,* 436 U.S. 103, 118, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978). In this regard, *Asahi Chem. Indus. Co. v. United States,* 12 CIT —, 692 F.Supp. 1376 (1988), overturned Commerce's practice of disallowing pre-sale warehousing expenses for a single product. *Asahi* found that the requirement of linking the warehousing expenses of yarn to a particular sale in order to verify costs was more stringent than the regulation requires, and is thus contrary to law:

> There was no other evidence before Treasury which would refute plaintiff's claim that warehousing expenses were paid only for yarn produced for the home market. Defendant alleges that the warehousing expenses should not be allowed since plaintiff would have incurred them regardless of whether plaintiff made *any* sales in the home market. That reasoning, conjectural since plaintiff *did* make sales in the home market, would not hold up when the period of investigation is a period of twelve months, as it is here. Plaintiff is a going business entity and it is unlikely that it would continue to stockpile yarn if no domestic sales were generated over a year's time.

*Id.* at —, 692 F.Supp. at 1379.

The warehousing expenses in *Asahi* were incurred for a single raw material used to manufacture the product under investigation. A different situation arises where pre-sale warehousing expenses are incurred on a variety of raw materials used to manufacture both the product under investigation and other products.

LMI states that "its inventory consists, *in part,* of merchandise produced to order for a customer from the customer's own copper and zinc." *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record,* at 50. Commerce found that while LMI incurred expenses to maintain the inventory of finished goods awaiting sale, LMI provided information as to only the "average cost of financing inventory during the period" in its questionnaire response. R. 310. At verification, LMI submitted documents which recorded inventory costs on an average monthly basis. Verification R. at 834–37.

It would be anomalous to the purposes of the antidumping statute if a foreign producer could offset its sales at less than fair value by claiming warehousing expenses for storage of not only materials used to manufacture the product under investigation and the finished product itself, but also the expenses of storing an unlimited variety of raw materials used to manufacture its entire product line and the expenses of storing finished merchandise other than that subject to investigation. The Court affirms Commerce's denial of a circumstance of sale adjustment for LMI's average costs of financing inventory.

### 4. *Currency Hedging Expenses*

◼ LMI engages in currency hedging for home market sales to cover foreign exchange exposure. R. 767. When LMI purchases copper and zinc for its manufacturing operations and pays for these raw materials in United States dollars for later sale in lira, LMI will purchase a forward contract to ensure the availability of dollars at the rate of exchange in effect when home market orders are placed. R. 767, 769; *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record,* at 45. LMI states that its hedging practices are not a function of its purchas-

es of raw materials, but are a function of its sales in Italy, and that LMI hedges its home market sales by purchasing forward currency contracts so that the value of those home market sales will not decline in dollar terms:

> If LMI did not hedge its home market sales, which are denominated in lira, the value of those sales in dollars would decline if the lira were depreciating, as it was during the period of investigation. This is important because LMI's raw material purchases occur in dollars. Hence, the dollar equivalent of LMI's home market sales in lira must be maintained if LMI is to sell profitably in its home market. By contrast, U.S. sales, which are denominated in dollars, never see their dollar value erode. Hence, U.S. sales always retain their dollar value relative to the dollar cost of raw materials.

> Because hedging is done to "lock in" the dollar value of home market sales it is a selling expense of those home market sales. It promotes the retention of value in dollars for home market sales. U.S. sales are not hedged. In dollars they will never decline in value. Hedging is not practiced to facilitate raw material purchases.... Hedging does no more than permit LMI to translate lira receivables into dollars so that the *actual proceeds of home market sales,* in dollars rather than lira, are fixed.

> Hedging, for LMI, is an expense incurred because it sells brass sheet and strip in Italy in lira, while buying copper and zinc in dollars. It is the sale in lira, not the purchases in dollars, that prompts LMI to hedge its home market sales. LMI hedges only its home market sales and does so at an identifiable cost. That cost causes home market sales to be more "expensive" and constitutes a difference in the circumstances of sale for which an adjustment should have been made.

*Plaintiff's Reply to Defendant's and Defendant–Intervenors' Responses in Opposition,* at 20–21.

Commerce denied an adjustment claimed for LMI's currency hedging expenses because those costs were related to LMI's general operations and not to the home market sales of the merchandise under investigation:

> Such risks exist with regard to the purchase of raw materials regardless of the destination of the final product. Therefore, these expenses must be viewed as general expenses to LMI, rather than selling expenses unique to the home market. Furthermore, even if these expenses were unique to the home market, they cannot be directly tied to the sales under investigation, and therefore, do not constitute an allowable circumstance-of-sale adjustment.

52 Fed.Reg. at 818.

The record shows that LMI imports copper and zinc "to keep a rolling stock on hand" which is drawn upon to manufacture all of the items in LMI's product line regardless of the ultimate destination of the product. R. 725–28. As the raw materials are essentially fungible, the zinc or copper could be withdrawn from the stockpiles and applied to either United States sales or home market sales in Italy. R. 727–28.

From the manner in which LMI maintains its inventories, LMI is unable to distinguish between the raw materials it purchases with hard currency earned from United States sales and that which it purchases on a currency hedging basis. It is not possible to determine whether the raw materials purchased with currency hedging were even used to produce the merchandise under investigation, because there is "no ear-marking of particular zinc or copper." R. 727.

Plaintiffs do not need to attribute each expense claimed to a particular sale in order to qualify for a circumstance of sale adjustment. *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 66, 592 F.Supp. 1318, 1334 (1984). The claimed expenses, however, "must be related to specific sales at issue—sales of certain products, during a certain period of time—rather than to sales generally." *Ipsco, Inc. v. United States,* 12 CIT ——, 687 F.Supp. 633, 642 (1988).

The Court finds that LMI did not meet its burden of proving to the satisfaction of

Commerce that the currency hedging expenses were directly related to sales of the merchandise under investigation. Commerce's denial of a circumstance of sale adjustment for currency hedging expenses is supported by the administrative record as a whole and is according to law.

### B. *Cost of Credit Based on Lira Borrowing Rate*

LMI claims that Commerce erred in calculating a cost of credit based on a short term lira borrowing rate in Italy rather than the prevailing interest rate in the United States. LMI urges that because the dollar borrowing rate at the relevant time was approximately 9.5%, as opposed to the approximate lira-based rate of 16%, common sense dictates that LMI would have obtained financing for its United States sales at the United States rate. LMI also argues that it is bound by an Italian law which was in effect for only a portion of the period under investigation. The law required all export sales involving credit which are invoiced in foreign currency to be financed with foreign currency loans. Ministerial Decree—Law of Jan. 16, 1986, *Gazzetta Ufficiale della Republica Italiana* No. 13 (Jan. 17, 1986).

#### 1. Exhaustion of Administrative Remedies

■ LMI admitted at oral argument that it did not raise the Italian credit financing law before Commerce. Administrative exhaustion of remedies is generally required before a litigant will be allowed to raise a claim via a civil action. *See* 28 U.S.C. § 2637(d) (1982); *Sharp Corp. v. United States*, 837 F.2d 1058, 1062 (Fed.Cir.1988); *Alhambra Foundry Co. v. United States*, 12 CIT ——, 685 F.Supp. 1252, 1256 (1988); Cameron & Polino, *The Impact of the Court on ITA Policies and Procedures—Too Much or Too Little?*, 10 B.C. Int'l & Comp.L.Rev. 241, 242–50 (1987) (application of the doctrine of exhaustion of remedies in the Court of International Trade). LMI has failed to provide sufficient reasons for not raising the issue of Italian law prior to Commerce's determination. A reviewing court usurps the agency's function when it

sets aside the administrative determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action. *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *Rhone Poulenc, Inc. v. United States*, 13 CIT ——, Slip Op. 89–34, at 18, 1989 WL 27802 (Mar. 21, 1989). No exceptions to the exhaustion doctrine apply here. The Court finds that LMI should be precluded from raising for the first time in this Court the issue of whether Italian law bars the imputation of credit costs based on a lira-borrowing rate.

#### 2. Calculation of the Short–Term Borrowing Rate

■ Commerce verified the existence of a lag time between the date of shipment and the date LMI received payment on its United States sales. Conf.R. 512–13. Because LMI does not specify credit costs or terms on its United States sales, Commerce found it necessary to impute this expense. Commerce explained the use of a lira-denominated short-term borrowing rate in calculating United States credit expenses:

> credit costs on U.S. purchase price sales were calculated by using the same short-term financing rate used to calculate credit costs in the home market.

52 Fed.Reg. at 818 (Comment 5). Commerce used this methodology to conform to an "established policy." *Id. See, e.g., Final Determination of Sales at Less Than Fair Value; Brass Sheet and Strip for the Republic of Korea*, 51 Fed.Reg. 40,833, 40,835 (Nov. 10, 1986).

LMI argues that because it is waiting for payment on United States sales, the imputed cost of credit should be based on a United States interest rate. LMI assumes that if it had borrowed money to finance its operations pending payment of accounts receivable, it would have borrowed that money in the United States at a lower rate of interest.

Defendant states that it would normally be expected that a firm would seek a line of credit from one of its own financial institutions. In situations in which a firm has not accounted for the time value of money on outstanding receivables, Commerce generally imputes the credit expense based upon what it would have cost the firm to borrow in its home market for that type of sale.

LMI asserts that it had "dollar denominated short term financing available" which should have indicated to Commerce that LMI would have used dollar denominated short term financing for its United States sales. Commerce verified that LMI had "several U.S. dollar short-term loans outstanding during the period of investigation to finance purchases of imported raw materials." R. 749. Given the nature of these loans, however, defendant states that Commerce did not deem them to be indicative of the type of financing that LMI might have obtained for its export sales to the United States. With regard to LMI's United States export sales, LMI "had no dollar-denominated short-term loans outstanding during the period of investigation." *Id.*

The Court finds that Commerce's calculation of LMI's cost of credit for its accounts receivable, using a short-term rate available to LMI in Italy rather than a rate that LMI's United States customers might have obtained in the United States if LMI had not extended credit, is supported by the administrative record as a whole and is according to law.

## II. THE COMMISSION'S MATERIAL INJURY DETERMINATION

LMI also challenges the Commission's final determination that a domestic industry in the United States is being materially injured by reason of less than fair value imports of brass sheet and strip from Italy as cumulated with dumped and subsidized imports from other countries, *Certain Brass Sheet and Strip from France, Italy, Sweden and West Germany*, Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316 and 317 (Final), USITC Pub. No. 1951, at 17 (Feb.1987), 52 Fed.Reg. 5839 (Feb. 22,

1987). LMI argues that (A) the Commission erred by cumulating Italian imports with other dumped or subsidized imports, and (B) no causal link between dumped imports and material injury to the domestic industry has been established.

### A. *Cumulation*

▪ LMI argues that in enacting 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987), Congress did not seek to mandate cumulative analysis in all investigations involving more than a single country. LMI claims that less than fair value imports from Italy should not have been cumulated with less than fair value imports or subsidized imports from other countries because imports from West Germany were of a sufficient amount so that their impact on the domestic industry could be evaluated on their own without the need to cumulate other imports, which, in comparison represented insignificant amounts. It claims that because West German imports represented from one-half to two-thirds of total import penetration throughout the period of review, the West German imports alone materially injure the domestic industry. LMI asserts that where a single country predominates in terms of import penetration, legislative intent would be frustrated if cumulation were to be permitted.

The starting point for interpreting a statute is the language of the statute itself, which will ordinarily be regarded as conclusive in the absence of a clearly expressed legislative intention to the contrary. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The cumulation statute provides that for the purposes of evaluating volume and price effects,

> the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987).

The cumulation statute does not distinguish between imports of large and small

volumes. The fact that dumped and subsidized imports compete with each other and with domestic like products in the United States market has been deemed to be sufficient to justify cumulation. *See Bingham & Taylor Div., Va. Indus. v. United States,* 815 F.2d 1482 (Fed.Cir.1987); *Fundicao Tupy, S.A. v. United States,* 12 CIT —, 678 F.Supp. 898, 902 (1988), *aff'd,*859 F.2d 915 (Fed.Cir.1988); Mock, *Cumulation of Import Statistics in Injury Investigations before the International Trade Commission,* 7 Nw. J. Int'l L. & Bus. 433 (1986).

The plain meaning of legislation should be conclusive, except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters. *United States v. Ron Pair Enterprises,* — U.S. —, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Where Congress has clearly stated its intent in the language of a statute, a court should not inquire further, for the Court must give effect to the unambiguously expressed intention of Congress. *ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988); *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 788 (Fed. Cir.) *cert. denied,* — U.S. —, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). Where the statute is silent or ambiguous with respect to a specific issue, the question for the court is whether the agency's action is based on a permissible construction of the statute. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); *National Labor Relations Bd. v. United Food and Commercial Workers Union,* 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987). Furthermore, the Commission's interpretation of the statute need not be the only reasonable construction or the one the court would adopt had the question arisen initially in a judicial proceeding. *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986).

LMI states the legislative history to the cumulation statute suggests that Congress sought to limit cumulation to instances where imports from individual countries were of such small magnitude that, viewed in isolation, injury could never be found. LMI states that where, as in this case, the facts clearly demonstrate the preeminence of a single country in terms of import penetration, legislative intent would be frustrated if cumulation were to be permitted. LMI cites language from the House Committee on Ways and Means Report on the Trade Remedies Reform Act of 1984, which became Title VI of the Trade and Tariff Act of 1984:

> The Committee amended the criteria to permit cumulation of imports from various countries that *each* account individually for a very small percentage of total market penetration, but when combined may cause material injury.

H.R. Rep. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5164 (emphasis added). LMI also cites language in the Committee Report on the Trade and Tariff Act, where the conferees stated that:

> The provision requires cumulation of imports from various countries that *each* account individually for a small percentage of total market penetration but when combined may cause material injury.

H.R.Rep. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5220, 5290 (emphasis added).

LMI argues that these statements evidence a legislative intent that the cumulation statute apply only where imports from each of several countries accounts individually for a very small or insubstantial percentage of penetration and cannot be cumulated with imports from a country which accounts for a substantial percentage of the import penetration.

While the legislative history cited might be characterized as ambiguous, the language of the cumulation statute itself does not exclude smaller volumes of imports from cumulation with larger volumes. When the plain language of the statute appears to settle the question presented, the court looks to the legislative history to determine only whether there is a "clearly expressed legislative intention" contrary to

the plain language which would require the court to question the strong presumption that Congress expresses its intent through the language it chooses. *See Immigration and Naturalization Serv. v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987); *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986); *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir.1989). The Court finds that there is no clearly expressed legislative intention to contravene the plain language of the statute.

The record shows that as a percentage of the imports in this investigation, the Commission could find it appropriate to include the Italian imports in the cumulative analysis. Conf. R. Doc. 73 at 74. The fact that the level of Italian imports is substantially less than the level of West German imports is an insufficient basis upon which to justify exclusion of Italian imports from the Commission's cumulative injury analysis under 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987). Under the circumstances of this case, the Court finds that the Commission could determine that Congress intended to include imports of this level in a cumulation analysis. *See American Lamb,* 4 Fed.Cir. (T) at 54, 785 F.2d at 1001.

The Omnibus Trade and Competitiveness Act of 1988 amended the cumulation statute to provide that the Commission is not required to cumulate imports in cases where the Commission determines that the imports subject to investigation are negligible and have no discernable adverse impact on the domestic industry. Omnibus Trade and Competitiveness Act of 1988, P.L. 100–418, § 1330(b), 102 Stat. 1107, 1207 (1988). *See also* H.R.Rep. No. 40, Part 1, 100th Cong., 1st Sess. 130–31 (1987). The changed law does not affect this case because the amendment applies only to investigations initiated after August 23, 1988. Omnibus Trade and Competitiveness Act of 1988, P.L. 100–418, § 1337(c), 102 Stat. 1107, 1211 (1988).

### B. *Causation of Material Injury*

The Commission determined that the domestic industry is materially injured by reason of less than fair value imports from France, Italy, Sweden, and West Germany, and subsidized imports from France. USITC Pub.1951, at 17. LMI does not contest the Commission's determination that the domestic industry is experiencing material injury, but argues that no causal link exists between the cumulated imports and the injury to the domestic industry because (i) increases and decreases in dumped imports parallel increases and decreases in domestic sales; (ii) the decline in domestic nontoll prices paralleled a decline in import nontoll prices; and (iii) the increases and decreases in import volume parallel increases and decreases in domestic volume.

■ In determining material injury by reason of imports under investigation, the Commission is not to weigh causes of injury, but is to determine whether imports contribute to conditions of the domestic industry. *See, e.g., British Steel Corp. v. United States,* 8 CIT 86, 96, 593 F.Supp. 405, 413 (1984). It is sufficient that the imports contribute, even minimally, to material injury. *Citrosuco Paulista, S.A. v. United States,* 12 CIT ——, 704 F.Supp. 1075, 1101 (1988); *Gifford–Hill Cement Co. v. United States,* 9 CIT 357, 368, 615 F.Supp. 577, 586 (1985).

■ In this investigation, the Commission cumulatively assessed the volume and effect of imports from Brazil, Canada, France, Italy, Korea, Sweden, and West Germany. USITC Pub.1951, at 13. The Commission found that the volume of imports followed the trend in domestic consumption—rising sharply from 1983 to 1984 and then declining. *Id.* at 13–14. Cumulated imports accounted for 15.6 percent of apparent domestic consumption in 1983, 21.0 percent in 1984, and 18.7 percent in 1985 and interim 1985. *Id.* at 14, A53 (staff report at table 20). Discounting the interim 1986 figures which reflected the impact of the investigations on brass imports, the Commission found that imports have taken an increasing market share since 1983. *Id.* at 14, A53 (table 20). The Commission found cumulated imports to have risen more rapidly relative to domes-

tic shipments than apparent consumption, which indicated that "the domestic industry has lost relative market position to the cumulated unfairly traded imports with the resulting loss in sales of the product and the revenues that would have been derived from such sales." *Id.* at 14. The Commission also found that the overall market share held by the cumulative imports was significant throughout the period of investigation. *Id.* at 13 (citing *Certain Brass Sheet and Strip from Brazil, Canada, and the Republic of Korea,* Inv. Nos. 701–TA–269 (Final) and 731–TA–311 (Final) and 731–TA–311, 312, and 315 (Final), USITC Pub.1930, at 14 (Dec.1986)).

To examine the impact of prices of the "substantial volumes of imports" on prices in the United States for like products, the Commission asked producers and importers to provide price data on nine brass sheet and strip products for nontoll and toll account sales for the quarters between January, 1983 and September, 1986. *Id.* at 14. Toll sales refer to metal-conversion contracts where the purchaser supplies the raw metal to the brass mill and, therefore, pays the mill for only the fabrication costs. *Id.* at 14, A56. Sales of imported brass sheet and strip on a toll account basis are rare, however, and a purchaser who wanted to buy imported brass on a toll account basis would have to arrange to purchase the metal and have it delivered to the foreign producer. *Id.* at A56 & n. 3.

The Commission found that the price data for toll sales showed that weighted-average prices generally increased from 1983 to 1985 for three brass products, accompanying both a rising market in 1984 and a falling market in 1985. *Id.* at 15, A60–62. Although prices declined in 1986 for two products, one of them remained above January–March 1983 levels and the other fell below that level by only one cent per pound. *Id.* at 15, A61 (staff report at table 21).

The Commission found that generally rising domestic prices for toll account sales contrasted with the nontoll account market, in which the Commission found competition from imports. *Id.* at 15. For three prod-

ucts, prices peaked in 1984 and then declined. *Id.* at 15, A63 (staff report at table 22). Two of these nontoll products were identical to the toll products, and the Commission found decreasing price trends for nontoll account sales predated the price declines for toll accounts by at least one year. *Id.* at 15. Thus, the Commission determined that the cumulative imports "are a significant factor in the trends in price divergences between toll account and nontoll account sales." *Id.*

For the nine brass products the Commission found that the nontoll account sales showed underselling by imports in the majority of instances where price comparisons were possible, with the highest level of underselling from Italian imports. *Id.* at 15, A67. For Italian imports, the Commission found underselling in all of the 30 direct comparisons. *Id.* at 16, A67. The Commission also discussed evidence of domestic sales lost to imports because of price, and its conclusion that price played an important role in purchasing decisions. *Id.* at 16, A84–87, Memorandum from the Office of Economics to the Commission, EC–K–042 (Feb. 6, 1987).

Based on the evidence cited, the Commission found that the

> significant price underselling of the domestic product by the cumulated imports and the lost sales information lead us to conclude in these investigations that there has been significant price depression by the cumulated imports from Brazil, Canada, France, Italy, Korea, Sweden and West Germany. This conclusion is buttressed by the facts that the cumulated imports competed almost exclusively for nontoll account sales and that price declines in the toll market are significantly later than in the nontoll account market. Finally, ... the cumulated imports have taken an increasing share of the domestic market. As a result, the cumulated imports have had an adverse material impact on domestic production and shipments and on domestic sales and profitability.

USITC Pub.1951, at 16–17.

Congress vested the Commission with broad discretion in analyzing import vol-

ume in both absolute and relative terms. 19 U.S.C. § 1677(7)(C)(i); *Copperweld Corp. v. United States,* 12 CIT —, 682 F.Supp. 552, 570 (1988). It is not this Court's function on review to reweigh evidence. *Citrosuco Paulista, S.A. v. United States,* 12 CIT —, 704 F.Supp. 1075, 1093 (1988); *Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT —, 669 F.Supp. 445, 449 (1987). The Commission found that the cumulative volume of imports rose and was significant throughout the period of investigation and that there had been significant underselling and price depression by cumulated imports, resulting in a material adverse impact on domestic production and shipments and on domestic sales and profitability. USITC Pub.1951, at 13–17. The Court finds that the Commission's material injury determination is supported by substantial evidence on the record as a whole and is according to law.

### CONCLUSION

Commerce's denial of circumstance of sale adjustments and Commerce's construction of a cost of credit borrowing rate are found to be according to law and supported by substantial evidence on the record as a whole. The Commission's material injury determination is supported by substantial evidence on the record and is according to law.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with that decision,

IT IS HEREBY ORDERED that this action is dismissed.