**GRANGES METALLVERKEN AB,**
**et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**American Brass, et al.,**
**Defendants–Intervenors.**

**Court No. 87–04–00583.**

United States Court of
International Trade.

June 7, 1989.

Sonnenberg, Anderson, O'Donnell & Rogriguez, Paul S. Anderson, Chicago, Ill., for plaintiffs.

Lyn M. Schlitt, General Counsel, James A. Toupin, Asst. General Counsel, U.S. Intern. Trade Com'n, Calvin H. Cobb, III, Washington, D.C., for defendant.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington and Kathleen Weaver Cannon, Washington, D.C., for defendants-intervenors.

DiCARLO, Judge:

Plaintiffs move pursuant to Rule 56.1 of the Rules of this Court to challenge the decision of the United States International Trade Commission that a domestic industry is materially injured by reason of cumulated imports of brass sheet and strip from Sweden and other countries. *Certain Brass Sheet and Strip from France, Italy, Sweden, and West Germany,* Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316 and 317 (Final), USITC Pub. No. 1951 (Feb. 1987). The Court has jurisdiction under 28 U.S.C. § 1581(c) (1982).

The Court holds that even if the Commission had found that some domestic purchasers perceived Swedish brass to be of a higher quality than other imports, the record supports the finding of a reasonable overlap in competition among imported and domestic brass to allow the Commission to cumulate Swedish brass with imports from Brazil, Canada, France, Italy, the Republic of Korea, and West Germany, even though domestic producers did not manufacture one brass sub-product during most of the period under investigation.

## THE MERCHANDISE

"Certain brass sheet and strip" refers to wrought brass sheet and strip of solid rectangular cross section over 0.006 inch but less than 0.188 inch in thickness, in coils or cut to length, whether or not corrugated or crimped, but not cut, pressed, or stamped to non-rectangular shape, and provided for in items 612.3960, 612.3952, and 612.3986 of the Annotated Tariff Schedules of the United States. USITC Pub.1951 at 6, A1 n. 1, A4. For tariff purposes brass sheet is over 20 inches wide, and strip is not over 20 inches wide. *Id.* at 6, A5. The generally accepted industry distinction between sheet and strip is that strip consists of brass that is coiled or wound on reels of whatever gauge or width, while sheet consists of brass that is no longer coiled or wound but has been cut to length. *Id.* at A5.

The brass products investigated are defined in the "C20000–series" under the nomenclature the Unified Numbering System and the equivalent "200–series" under the Copper Development Association numbering system. *Id.* at A4. The chief characteristics of C20000 series brass are ease of manufacture, fair electrical conductivity, excellent forming and drawing properties, and good strength. *Id.* at 7. Brass sheet and strip have numerous uses, including ammunition, automotive radiators, door hardware and bathroom accessories, electrical connectors, jewelry, and lamp bases. *Id.*

## DISCUSSION

### I. *Competition*

Plaintiffs submit that there is no substantial evidence to support cumulation of Swedish brass with other imports because the Commission (A) failed to account for substantial evidence relating to the fungibility of imported and domestic products, and (B) did not determine whether imported and domestic products are within a reasonable price range.

### A. Fungibility

Plaintiffs state that the record is replete with evidence confirming the lack of fungibility and competition due to the superior quality of Swedish brass products as compared to brass products from other sources. R. List 1, Doc. 274, at 136–39, 143. Plaintiffs argue that the Commission failed to account for this evidence in its determination.

To invoke the cumulation statute, the imports to be cumulated must compete with one another and with the domestic like products they allegedly injure. 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987); *LMI—La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, ——, 712 F.Supp. 959, 969 (1989); Mock, *Cumulation of Import Statistics in Injury Investigations before the International Trade Commission*, 7 Nw.J.Int'l L. & Bus. 433, 441 (1986).

In its earlier determination on *Certain Brass Sheet and Strip from Brazil, Canada, and the Republic of Korea*, Inv. Nos. 701–TA–269 and 731–TA–311, 315, and 315 (Final), USITC Pub.1930 (Dec. 1986), the Commission found evidence that domestic and imported C20000 series brass sheet and strip did "compete with one another" after it considered: (1) the degree of fungibility between the products; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of imports in the market. *Id.* at 12–13. Referring to that earlier determination in its determination on *Certain Brass Sheet and Strip from France, Italy, Sweden, and West Germany*, the Commission stated that "[i]n these investigations, no new information has been brought to our attention that leads us to believe that cumulation is inappropriate or that imports from any individual country should be excluded from a cumulative analysis." USITC Pub. 1951, at 12. In its decision to include Swedish imports in its cumulative analysis, the Commission considered the arguments of the Swedish producers that their imports should not be cumulated with those from other countries:

> They raised a number of grounds on which their product allegedly did not compete with other imports or with the domestic like product. Post–Hearing

Brief of Metallverken Inc. and Metallverken AB [R. List 2, Doc. 30.] at 1–4. However, these are the same arguments that were before us and that we rejected in [*Certain Brass Sheet and Strip from Brazil, Canada, and the Republic of Korea,* Inv. Nos. 701–TA–269 and 731–TA–311, 315, and 315 (Final), USITC Pub. 1930 (Dec. 1986)]. Keeping in mind the range of product covered by this investigation, the differences that exist between the imports from Sweden and other imports and between the imports from Sweden and the domestic like product are not sufficient for us to find that the Swedish product does not compete with other imports or the domestic like product "in any meaningful sense."

USITC Pub.1951, at 12 n. 32 (citing *Certain Carbon Steel Pipes and Tubes from the People's Republic of China, the Philippines, and Singapore,* Inv. Nos. 731–TA–292 through 296 (Preliminary), USITC Pub. 1796, at 17 (Dec. 1985)).

Plaintiffs argue that Swedish products do not compete with other imports because:

(1) The French primarily produce brass reroll of standard quality while Metallverken does not sell reroll products. R. List 1, Doc. 274, at 136, 139.

(2) The Germans produce high-quality brass, as does Metallverken, but brass products from these two countries do not compete because "[the] Swedes sell especially thin [gauges] for unique applications with which the German producers do not compete." *Id.* at 137.

(3) Imports from Italy, Korea, and Canada do not compete with Swedish imports "also due to quality reasons and due to the fact that they are engaged primarily in producing and selling more standardized products rather than the specialty brass produced by Metallverken." *Plaintiffs' Motion for Judgment Upon an Agency Record,* at 11 (citing R. List 1, Doc. 274, at 136).

(4) Brazilian brass does not compete with the Swedish product "because the Brazilian product does not compete in the higher-quality markets." *Id.* (citing R. List 1, Doc. 274, at 143).

Plaintiffs claim that there is substantial evidence showing that Swedish products are "of higher quality than others and that many of the imports are not as substitutable for domestic product[s] due to lead times, metal-fixing methods and quality considerations." *Id.* at 20.

Plaintiffs also argue that "quality is the major factor considered by most purchasers in determining brass sheet and strip purchases." *Id.* at 11 (citing R. List 2, Doc. 73, at A107; USITC Pub.1951 at A78). Plaintiffs point out that in a customer survey conducted by the Commission staff, 64 percent cited quality as the most important factor in purchasing and over 85 percent ranked price and quality among the top three factors in their purchasing decisions. USITC Pub.1951 at A78. Additionally, "approximately one-half of the largest end-users stated that imported Swedish brass sheet and strip is superior to U.S. produced brass," and two distributors reported that mills in Sweden, West Germany, France, and Italy "produce brass strip with a better finish, or surface quality, and that some customers believe that finish is an indicator of metallurgical quality." *Id.* at A78–79. Plaintiffs also note that two end users mentioned that Swedish and West German brass is more consistent with respect to gauge control and yields more feet per pound than United States brass despite recent advances in statistical process control. *Id.* at A79. Three purchasers also reported paying a premium for West German brass and one purchaser reported paying a premium for Swedish brass. *Id.* at A79 n. 2.

Plaintiffs state that in addition to the customer survey, there is further evidence "indicating the tremendous quality and fungibility differences between the Swedish product and all other imports and domestic brass sheet and strip." *Plaintiffs' Motion for Judgment Upon an Agency Record,* at 13 (citing R. List 2, Doc. 74). Plaintiffs also argue that while Swedish producers manufactured brass for caskets, the Commission failed to account for the fact that there was no domestic production of this brass sub-product during most of

the period of investigation. *Id.* at 16. Plaintiffs reason that

> considering plaintiffs' minimal market penetration ratios ... and the fact that a significant portion of that small market penetration consists of products that were not produced domestically during [most of] the period of investigation, the lack of fungibility between Swedish products, other imports and domestic products is readily apparent (particularly when quality is also considered) and the Commission's determination that these products are fungible is not supported by substantial evidence of record.

*Id.*

■ It is not the Court's function to reweigh the evidence, but to decide whether the Commission's determinations are supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B) (1982); *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984); *Citrosuco Paulista, S.A. v. United States,* 12 CIT ——, ——, 704 F.Supp. 1075, 1093 (1988). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Matsushita,* 750 F.2d at 933. The substantiality of evidence must also take into account whatever in the record fully detracts from its weight. *Universal Camera Corp.,* 340 U.S. at 477, 71 S.Ct. at 459; *National Ass'n of Mirror Mfrs. v. United States,* 12 CIT ——, ——, 696 F.Supp. 642, 644 (1988).

The Commission has previously analyzed competition among imports and domestic products by determining whether there is a "reasonable overlap" in competition. For example, in one prior determination the Commission cumulated the volume and effect of imports based on the "reasonable overlap in the geographic and end-user markets in which the imports and the domestic like product [were] sold," despite allegations of quality differences and evidence that certain products were predominantly sold in discrete end-use markets. *Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan,* Inv. Nos. 731–TA–278–80 (Final), USITC Pub. 1845, at 9 (May 1986). In affirming the Commission's determination in that action, the court found that

> it was reasonable [for the Commission] to find that there was sufficient evidence of overlap in the end-use market which, given the fungibility and similar quality of the imports, the similar time period involved, and the geographic overlap of the markets, justified a conclusion that the imports from Brazil competed with imports from Korea and Taiwan and the domestic like product within the meaning of the cumulation provision.

*Fundicao Tupy, S.A. v. United States,* 12 CIT ——, ——, 678 F.Supp. 898, 902 (1988), *aff'd,* 859 F.2d 915 (Fed.Cir.1988).

The Commission argues that although a custom product delivered to the customer may be unique, there is competition in this industry because other producers also sought to sell that same merchandise to the same customer:

> In this respect, there is competition for sales of custom products.... The Commission has often found goods to be fungible where producers manufacture goods to specifications, and domestic and foreign producers alike are able to manufacture a range of products as specified by the customers.

*Defendant's Memorandum in Response to Plaintiffs' Motion for Judgment on the Record,* at 23 (citing R. List 2, Doc. 74, at 5).

Although plaintiffs claim that Swedish brass products are not fungible with other imported and domestic products, the confidential record is to the contrary. R. List 2,

Doc. 74, at 3 (France, Italy, Sweden and West Germany). *See also* R. List 2, Doc. 66, at 2 (Brazil, Canada, and Korea).

The Commission analyzed competition with respect to standard brass sheet and strip by comparing sales of nine categories of brass products, with dimensions identified by the Commission staff as common denominators in the industry. USITC Pub. 1951 at A58. Categories designed to segregate comparable products were defined by the four major price factors identified by purchasers (i.e., alloy, gauge, width, and market segment), so that an additional annealing step would not be necessary to reduce the brass product from the thickest to the thinnest gauge within the category. *Id.* at A59, B42. Categories were also designed to segregate products normally sold to rerollers, distributors, and end users, so that products within each category were comparable in stage of production and in end use. *Id.* at B42.

Sales data were available for Swedish imports in several common product categories, with price comparisons for product 1 (builders' hardware), product 2 (slitting stock .02 to .25 inch thick), product 5 (slitting stock .016 to .0199 inch thick), as well as for Swedish electrical stamping and wiring imports which varied only slightly from the domestic product. *Id.* at A75–76; R. List 2, Doc. 72 at 6–7; Doc. 74 at 5; Doc. 76.165A; Doc. 76.199. Domestic producers sold all of the common categories of brass products during the period of investigation. USITC Pub.1951 at A61, A63.

In addition to this support for finding competition with the domestic product, the record also supports a finding of competition among the imports. Product 1 was sold by Swedish, Brazilian, French, Italian, Korean and West German producers. *Id.* at A 70, B36; *Brazil, Canada, and Korea,* USITC Pub.1930 at A62. Product 2 was sold by Swedish, Brazilian, Canadian, French, Italian, Korean, and West German producers. R. List 2, Doc. 73, at A95 (table 23); *Brazil, Canada, and Korea,* USITC Pub.1930 at A60. Product 3 was sold by Swedish, French, and West German producers. R. List 2, Doc. 73, at A100, A104.

Product 5 was sold by Swedish, Brazilian, Canadian, Italian, Korean, and West German producers. *Id.* at A96 (table 24); *Brazil, Canada, and Korea,* USITC Pub.1930 at A61. Thus, Swedish brass was sold in the United States (1) as slitting stock along with United States, Brazilian, Canadian, French, Italian, South Korean, and West German brass; (2) for builders' hardware along with United States, Brazilian, French, Italian, South Korean, and West German brass; and (3) for electrical stamping and wiring products in direct competition with United States brass. R. List 2, Doc. 73, at A95–97, A101–05, B36–37, B40.

■ Although quality appeared to be a major factor in purchaser's decisions, price was also a major factor. It is not unreasonable for the Commission to find that domestic purchasers prefer to purchase higher quality goods that are available at a cheaper price than domestic goods or other imports perceived to be inferior. "Competition" consists of rivalry in the marketplace, where goods will be bought from those who, in view of buyers, provide "the most for the money." J.P. Friedman, *Dictionary of Business Terms* 109 (1987). The sales data and other information in the confidential record support the Commission's finding that the Swedish products competed with the domestic and imported products. R. List 2, Doc. 74, at 3. Even with respect to casket brass, fungible products competed directly for sales during the period of investigation. *Id.* at A104 n. 1. The fact that Swedish casket brass was sold in the United States for most of the period under investigation without a domestic counterpart does not undermine the Commission's conclusion that Swedish brass competed with domestic and other imported brass. The Commission need not track each sale of individual sub-products and their counterparts to show that all imports compete with all other imports and all domestic like products. Rather, the Commission need only find evidence of reasonable overlap in competition to support its determination to cumulate imports.

The record indicates that (i) many domestic and foreign suppliers, including Swedish

suppliers, sold customized brass products, (ii) Swedish producers sold at least three of nine standard products in the United States during the period of investigation, and (iii) sales of practically identical products at comparable prices were made by domestic and foreign producers, including Swedish producers, during most of the period of investigation. The record also shows that Swedish and domestic producers sold some casket brass during the period of investigation. R. List 2, Doc. 73, at 104 n. 1. The record thus supports the Commission's conclusion that domestic and imported brass were fungible and that Swedish imports competed with the domestic like products and other subject imports.

While plaintiffs also claim that virtually all Swedish brass imports are of uniquely high quality, the record is mixed as to this assertion. R. List 2, Doc. 30 (exhibit III). The record nonetheless supports a finding that both the domestic like products and other imports were of comparable quality. One domestic producer testified that it could "compete with the quality of any foreign import in the world" and could produce brass products "equivalent to any of theirs in the world and meet their quality requirements." R. List 1, Doc. 274, at 44. A competitor of that domestic producer corroborated the accuracy of this testimony and stated that it could "also do that." *Id.* A West German producer testified that he knew "of only a few sources that can meet the high quality requirements of these customers" and identified "German producers, the Japanese, the Dutch, some domestic producers, and in certain unique markets, the Swedes." *Id.* at 135.

Swedish producers competed with West German and other foreign and domestic producers in sales of products 1, 2, 3, and 5. These categories have standard dimensions which exclude "especially thin" gauges designed for unique applications. Yet even as to these "especially thin" gauges, the plaintiffs acknowledge that the West German and Swedish producers have similar gauge control. *Plaintiffs' Motion for Judgment Upon an Agency Record,* at 13. While plaintiffs also cite the "superior tin-ning" of Swedish products and allege it to be a sign of high quality, the product under investigation, C20000 brass, contains no tin and "superior tinning" is therefore irrelevant.

## B. Reasonable Price Range

Although the Commission considered price comparisons, plaintiffs argue that the comparisons are inadequate to analyze competition and the Commission's conclusions based on these comparisons are unsupported by substantial evidence of record.

Eight price comparisons showed Swedish underselling by 17.9 percent for builders' hardware and one sale of heavier gauge slitting stock evidenced overselling by 19.9 percent. USITC Pub.1951 at A75. The Commission thus found that "[f]or Sweden, there was underselling in seven of eight direct comparisons." *Id.* at 16.

Plaintiffs admit that the data "showed underselling by the Swedish material ... and a mixed pattern of overselling and underselling, with prices being very close...." *Plaintiffs' Motion for Judgment Upon an Agency Record,* at 16–17 (citing R. List 2, Doc. 73 at A103–05). Plaintiffs complain that the Commission failed to account for "what appear to be large price differentials found between casket brass and other products." *Id.* at 17. Plaintiffs state that "total delivered prices on those products were significantly higher than for the other products under comparison." *Id.* at 18 (citing R. List 2, Doc. 76.18) (addendum to questionnaire response). Since casket brass comprised [a confidential percentage] of shipments during 1986, is priced higher, and had no domestically-produced counterparts during most of the period under investigation, plaintiffs argue that a finding that these products compete could not be based on substantial evidence of record.

■ The plaintiffs' claim that the Commission should have accounted for price differentials fails because there is no requirement for the Commission to conduct a price range analysis in an injury investiga-

tion. *Negev Phosphates, Ltd. v. United States*, 12 CIT ——, ——, 699 F.Supp. 938, 942 (1988).

 The Commission states that it did not separately address price to analyze competition because, as with quality, price is an implicit element of the fungibility analysis. While it is an abuse of discretion for an agency to fail to consider an issue properly raised by the record evidence, *Timken Co. v. United States*, 10 CIT 86, 97, 630 F.Supp. 1327, 1337–38 (1986), the fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties. *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT ——, —— – ——, 696 F.Supp. 642, 648–49 (1988); *Empire Plow Co. v. United States*, 11 CIT ——, ——, 675 F.Supp. 1348, 1354 (1987); *British Steel Corp. v. United States*, 8 CIT 86, 98, 593 F.Supp. 405, 415 (1984). The Commission is presumed to have considered all of the evidence in the record, especially where the facts allegedly ignored were presented at an open hearing. *National Ass'n of Mirror Mfrs.*, 12 CIT at ——, 696 F.Supp. at 648. While this presumption can be rebutted, the record in this investigation is convincing that the Commission fully considered the testimony and supplemental questionnaire responses presented by the Swedish manufacturers to support their arguments that their products should not be cumulated with other imports. R. List 3, Doc. 1, at 6–8. *See also* R. List 2, Docs. K and L(7), at 1–4. It is not the Court's function to decide that it would have made another decision of the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984); *National Ass'n of Mirror Mfrs.*, 12 CIT at ——, 696 F.Supp. at 644.

## II. *Cumulation of Large and Small Volumes of Imports*

 Plaintiffs assert that the Commission's determination to cumulate is not in accordance with law because the Commission failed to take note of legislative history to the cumulation statute, 19 U.S.C. § 1677(7)(C)(iv) (Supp. V 1987), which allegedly precludes cumulation of imports from countries with large and small volumes of imports. *See* H.R.Rep. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5127, 5164; H.R.Rep. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5220, 5290.

This claim was rejected in *LMI–La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, —— – – ——, 712 F.Supp. 959, 969–971 (1989), which held that while the legislative history may be ambiguous, the language of the cumulation statute itself does not exclude smaller volumes of imports from cumulation with larger volumes. *See also Republic Steel Corp. v. United States*, 8 CIT 29, 33, 591 F.Supp. 640, 644 (1984) ("Cumulation is essential ... when a subsidized [or dumped] source, again not sufficient individually to cause injury to the industry, adds to the injury caused by larger sources").

Plaintiffs also state that the level of its imports is "quite minimal" and had a "negligible" impact on domestic prices. *Plaintiffs' Motion for Judgment Upon an Agency Record*, at 26, 33. The Omnibus Trade and Competitiveness Act of 1988, P.L. 100–418, § 1330(b), 102 Stat. 1107, 1207 (1988), amended the cumulation statute to permit the exclusion of "negligible" imports from the Commission's cumulative analysis. The amendment does not affect this case because it applies only to investigations initiated after August 23, 1988. *Id.* § 1337(c), 102 Stat. at 1211.

## III. *Allegation of No Injury From Swedish Imports*

Plaintiffs contend that the affirmative injury determination "with respect to Sweden" is unsupported by the record.

 The Commission did not make a specific material injury determination "with respect to Sweden." Rather, the Commission made its determination under 19 U.S. C. § 1677(7)(C)(iv) by assessing the cumula-

tive volume and effect of the imports on the domestic industry. The Commission determined that the cumulative volume of imports was significant throughout the period of investigation and that there had been significant underselling and price depression by cumulated imports, resulting in a material adverse impact on domestic production and shipments and on domestic sales and profitability. USITC Pub.1951 at 13–14, 16–17. It is sufficient that the imports contribute, even minimally, to material injury. *LMI—La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, ——, 712 F.Supp. 959, 971 (1989); *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, ——, 704 F.Supp. 1075, 1101 (1988).

The plaintiffs do not contest the finding of injury to the domestic industry, but argue that (a) price data elicited from questionnaires were inadequate and not sufficiently reflective of Swedish imports, and (b) the Commission's reliance on allegations of lost sales was misplaced.

### A. Price Data

Plaintiffs complain that price data submitted by importers of Swedish brass yielded eight quarterly price comparisons, while questionnaires for other countries yielded 35 comparisons for France, 30 for Italy, 59 for West Germany, 27 for Brazil, 25 for Canada, and 28 for Korea. *Plaintiffs' Motion for Judgment Upon an Agency Record*, at 35. *See* R.List 1, Doc. 274, at 164–65. Plaintiffs argue that sales in only eight out of a possible 126 quarters is insufficient to compare Swedish and domestic prices, and that most of the sales were in standardized product groups and occurred when the dollar was stronger. Plaintiffs complain that questionnaires were designed to "catch the Swedes" in those categories involving more standardized, non-specialty products. *See* R.List 2, Doc. R, at 1.

The Commission staff requested nontoll price data from domestic producers and importers with respect to nine categories of products, and toll data with respect to four of those nine categories. The Commission states that the categories were designed to segregate comparable brass sheet and strip products. The Commission defined product categories according to specifications relating to the four major price factors—alloy, gauge, width and market segment. R.List 2, Doc. 73, at A83. To control for quarterly price changes due solely to slight changes in the product specifications sold within a product category, the Commission asked producers and importers to provide data for the same item throughout the period of investigation. USITC Pub.1951 at A58–59. Since price variations were more closely related to the number of annealing steps rather than to the precise gauge of a given product, the Commission selected the particular category specifications so that an additional annealing step would not normally be necessary to reduce brass sheet and strip from the thickest to the thinnest gauge within a category. *Id.* at B42. Finally, the Commission designed the categories to control for level of sale. Slitting stock, sold to distributors, for example, was made one category, while builders' hardware, sold to hardware manufacturers, fell into a separate category. *Id.*

■ Congress set no minimum standard by which to measure the thoroughness of a Commission investigation, *Atlantic Sugar Ltd. v. United States*, 744 F.2d 1556, 1561 (Fed.Cir.1984), and the Commission has broad discretion to pursue an investigation in a manner that will provide substantial evidence for its determinations. *Negev Phosphates, Ltd. v. United States*, 12 CIT ——, —— –——, 699 F.Supp. 938, 950–51 (1988); *Alberta Pork Producers' Mktg. Bd. v. United States*, 12 CIT ——, ——, 683 F.Supp. 1398, 1402 (1988). Although an agency's failure to collect pertinent data may constitute an abuse of discretion, *Timken Co. v. United States*, 10 CIT 86, 97, 630 F.Supp. 1327, 1337–38 (1986), the Court finds that the plaintiffs have not established that the Commission's determination does not rest upon substantial evidence.

### B. Lost Sales

Plaintiffs also argue that the Commission's reliance on allegations of lost sales is misplaced.

■ Reliance on lost sales data may be a helpful analytical tool in injury investigations, but with fungible goods, volume rather than anecdotal evidence may be the best indicator of lost sales. *Negev Phosphates*, 12 CIT at ——, 699 F.Supp. at 942; *USX Corp. v. United States*, 11 CIT ——, ——, 655 F.Supp. 487, 491 (1987); *Lone Star Steel Co. v. United States*, 10 CIT 731, 733–34, 650 F.Supp. 183, 186 (1986).

Lost sales data indicate that purchasers especially interested in quality often purchased brass from several countries. One purchaser bought brass from Brazil, Canada, Sweden and West Germany, as well as from domestic suppliers, while another purchased imported brass exclusively from Canada. A third purchaser noted that Korean brass was of very good quality. A fourth producer bought brass from domestic, Swedish, and West German suppliers because quality was its main concern.

While plaintiffs may offer an alternative interpretation of the evidence, it has failed to show that the Commission's determination does not rest upon such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984); *Negev Phosphates*, 12 CIT at ——, 699 F.Supp. at 942.

## CONCLUSION

■ The Court finds that the Commission's determination to cumulate imports of brass sheet and strip from Sweden with dumped and subsidized imports from other countries is supported by substantial evidence on the record as a whole and is according to law. The Court affirms the Commission's material injury determination in *Certain Brass Sheet and Strip from France, Italy, Sweden, and West Germany*, Inv. Nos. 701–TA–270 and 731–TA–313, 314, 316 and 317 (Final), USITC Pub. No. 1951 (Feb.1987), as it applies to imported brass sheet and strip from Sweden.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with that decision,

IT IS HEREBY ORDERED that this action is dismissed.